IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2016 Term

_____

No. 15-0926

_____

FILED

November 15, 2016

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

LAWYER DISCIPLINARY BOARD,
Petitioner

v.

EDWARD R. KOHOUT,
Respondent

_____

Lawyer Disciplinary Proceeding
Nos. 14-01-015, 14-01-274, 14-01-301, 14-01-382

LAW LICENSE ANNULLED

_____

Submitted: October 25, 2016
Filed: November 15, 2016

Andrea J. Hinerman, Esq.                    Rachel L. Fetty, Esq.
Office of Disciplinary Counsel               Big Tree Law
Charleston, West Virginia                    Morgantown, West Virginia
Counsel for the Petitioner                   Counsel for the Respondent

JUSTICE BENJAMIN delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.      "This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syl. pt. 3, *Comm. on Legal Ethics v. Blair*, 174 W. Va. 494, 327 S.E.2d 671 (1984).

2.      "A *de novo* standard applies to a review of the adjudicatory record made before the [Lawyer Disciplinary Board] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [Board's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the [Board's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record." Syl. pt. 3, *Comm. on Legal Ethics v. McCorkle*, 192 W. Va. 286, 452 S.E.2d 377 (1994).

3.      "Where an attorney writes a worthless check under circumstances that demonstrate dishonesty or misrepresentation . . . or conduct that adversely reflects on fitness to practice law . . . , disciplinary punishment is warranted. It should be shown that the attorney was either aware that the check was worthless when it was written or failed to make it good within a reasonable period of time after the attorney was aware the

i

account had insufficient funds." Syl. pt. 3, *Comm. on Legal Ethics v. Taylor*, 187 W. Va. 39, 415 S.E.2d 280 (1992).

4.  "In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession." Syl. pt. 3, *Comm. on Legal Ethics v. Walker*, 178 W. Va. 150, 358 S.E.2d 234 (1987).

5.  "Aggravating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify an increase in the degree of discipline to be imposed." Syl. pt. 4, *Lawyer Disciplinary Bd. v. Scott*, 213 W. Va. 209, 579 S.E.2d 550 (2003).

6.  "Mitigating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify a reduction in the degree of discipline to be imposed." Syl. pt. 2, *Lawyer Disciplinary Bd. v. Scott*, 213 W. Va. 209, 579 S.E.2d 550 (2003).

7.  "Mitigating factors which may be considered in determining the appropriate sanction to be imposed against a lawyer for violating the Rules of

Professional Conduct include: (1) absence of a prior disciplinary record; (2) absence of a dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith effort to make restitution or to rectify consequences of misconduct; (5) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (6) inexperience in the practice of law; (7) character or reputation; (8) physical or mental disability or impairment; (9) delay in disciplinary proceedings; (10) interim rehabilitation; (11) imposition of other penalties or sanctions; (12) remorse; and (13) remoteness of prior offenses." Syl. pt. 3, *Lawyer Disciplinary Bd. v. Scott*, 213 W. Va. 209, 579 S.E.2d 550 (2003).

Benjamin, Justice:

This lawyer disciplinary proceeding arises from four separate complaints filed with the Lawyer Disciplinary Board ("LDB") concerning attorney Edward "Ed" R. Kohout. Following an evidentiary hearing, the Hearing Panel Subcommittee ("HPS") of the LDB issued a report in which it determined that Mr. Kohout engaged in unethical conduct, violating Rules 1.1, 1.2(a), 1.3, 1.4(a) and (b), 1.5(a), 1.15(a) and (b), 3.1, 5.4(a), 8.1(a), and 8.4(c) and (d) of the West Virginia Rules of Professional Conduct.[1] The HPS recommended that Mr. Kohout's law license be annulled, that he make restitution to client Sonja Richard in the amount of $2,059.66, and that he be ordered to pay the costs of the disciplinary proceedings. The Office of Disciplinary Counsel ("ODC"), on behalf of the LDB, urges that the Court adopt the sanctions recommended by the HPS. Mr. Kohout insists that annulment is too severe a penalty for his misconduct.

After careful consideration, we conclude that Mr. Kohout's unethical behavior warrants the annulment of his law license and the additional sanctions recommended by the HPS.

---

[1] Unless otherwise specified, references to "Rules" in this opinion are to the West Virginia Rules of Professional Conduct. Additionally, we note that the Court approved comprehensive amendments to the Rules, which became effective on January 1, 2015. Because the events giving rise to this disciplinary proceeding all occurred before January 1, 2015, we rely on the version of the Rules in effect at the time of those events.

1

## I. FACTUAL AND PROCEDURAL BACKGROUND

Mr. Kohout was admitted to the West Virginia State Bar on November 4, 1987, upon successful completion of the bar exam. At all times pertinent to this proceeding, he has maintained a law practice in Morgantown, West Virginia. This case arises from four complaints filed against Mr. Kohout with the LDB. Based on these complaints, the Investigative Panel of the LDB filed a Statement of Charges with the Court on September 25, 2015, to which Mr. Kohout filed an answer on October 19, 2015.

The HPS held a hearing on the Statement of Charges on January 25 and 26, 2016. During the hearing the HPS heard testimony from twelve witnesses, including Mr. Kohout. On June 3, 2016, the HPS filed its report, in which it examined each of the complaints filed against Mr. Kohout. The HPS determined that Mr. Kohout had violated the Rules and recommended sanctions.

### A. Complaint of the ODC, No. 14-01-015

From 2012 through 2014, Mr. Kohout represented owners of property in Big Bear Lake Camplands ("Big Bear"), a deeded property development, in a case against the Big Bear Property Owners Association, Inc. and Nancy Friend, the operator of Big Bear. The property owners disputed the propriety of increases in their annual assessments and other fees.

By letter dated September 22, 2012, addressed to "the residents of Big Bear Camplands," Mr. Kohout wrote:

> I have been asked to initiate a lawsuit challenging the manner in which [Nancy Friend] runs Big Bear . . . . Your names will need to be added to the Complaint as plaintiffs along with all the residents of Big Bear who wish to join in this. . . .
>
> Some of you have sent me money for a retainer fee, which I appreciate. I may need to bill you for additional funds as the case progresses for expenses, but it will [be] a modest sum evenly split among you and will be money well spent. . . .
>
> My fee arrangement will be as follows. In addition to the retainer, I'll keep track of my time at an hourly rate of $200/hr, which is modest by Morgantown standards. If we recover any money by way of settlement or jury verdict or judgment I'll keep the standard one-third contingent fee plus expenses (court reporter fees, court fees, etc[)], and the rest will be split evenly among you.

At the time Mr. Kohout sent this letter, his records show that he had received approximately $1,500.00 from more than twenty Big Bear property owners. Mr. Kohout did not enter into a written fee agreement with any of the Big Bear property owners.

By letter dated December 11, 2012, Mr. Kohout wrote again to the residents of Big Bear, telling the property owners that a suit had been filed against Big Bear Owners Association, Inc. and Nancy Friend under the names of Charles and Lorraine Galford. In the letter, Mr. Kohout requested that the recipients "please accept this letter as an invoice for $50 from each of you to keep this case going. . . . You can tell

3

any other residents who have not yet joined this action can join by contacting me and paying the $50 filing fee."

On January 16, 2013, Mr. Kohout sent another letter updating the Big Bear property owners on the status of the case and requesting additional funds. By letter dated February 7, 2013, Mr. Kohout advised that the case had been transferred to Preston County and that he required additional funds, asking that each recipient "send in another $50 payable to Ed Kohout." Mr. Kohout made a substantially similar request in a subsequent letter dated February 19, 2013. By letter dated February 25, 2013, Mr. Kohout clarified that he required that the residents pay "a simple $50 a month to keep this case going," and advised that he would withdraw from the case if he did not "receive everyone's payments by next week." With updates on the status of the case, Mr. Kohout sent more letters to the Big Bear property owners on May 17, 2013, August 5, 2013, and September 4, 2013, each time requesting a monthly fee of $50.

By letter dated October 21, 2013, Mr. Kohout informed the Big Bear property owners that their case had been dismissed. In addition, he wrote:

> You have the right to file an appeal within 30 days, but I would need payment of at least $3,000 up front before starting to work on that and I am not optimistic that our Supreme Court will even hear the case. I think our chances, at best, are 50-50. If anyone of you wants to write me a check then I'll be happy to file the appeal. But for now, the case is over. . . . I actually lost money on the case in terms of the

> value of my time spent verses what little I was paid, by some
> of you, and for which I am grateful.

Mr. Kohout's records show that at the time the case was dismissed, he had collected a total of $4,850.00 from the Big Bear property owners, $400.00 of which was paid to him by the Galfords. During the pendency of the litigation, all of the money Mr. Kohout received from the Big Bear property owners was deposited into his law office's operating account with United Bank.

On October 31, 2013, Mr. Kohout filed a notice of appeal with the Court in the Big Bear case, attaching a check for the $200 filing fee. The check, numbered 3149, was dated October 29, 2013, and was drawn on Mr. Kohout's operating account with United Bank. On December 3, 2013, Mr. Kohout gave the files associated with the case to Charles Galford, one of the named plaintiffs in the Big Bear action. By letter dated December 11, 2013, the Clerk's Office informed Mr. Kohout that on December 4, 2013, check number 3149 had been returned for non-sufficient funds. The Clerk's letter directed Mr. Kohout to provide the Clerk with a cashier's check or money order for the $200 filing fee within seven days of receipt of the letter. Mr. Kohout did not respond to this letter.

On December 13, 2013, Mr. Kohout filed a motion with the Court to withdraw as counsel in the case. On January 8, 2014, the Court denied the motion to withdraw for failing to comply with the Rules of Appellate Procedure. Ms. Edythe Nash

Gaiser, Deputy Clerk, telephoned Mr. Kohout and advised him that his motion to withdraw had been denied, that he was expected to comply with the scheduling order and file a brief in the case, and that he continued to have an outstanding debt with the Court because of the unpaid $200 filing fee. In response, Mr. Kohout wrote a letter to the Court Clerk that same day, stating:

> Your assistant (I think her name was Edie?) called today and advised me that the Court had denied my motion to withdraw from this case. I have already withdrawn from the underlying case[2] and my client[s] picked up their file and have moved on. I think my reaction to the decision may have offended her and for that I apologize. My secretary quit on me suddenly with a note last week for things have been hectic here. She then advised that the filing fee had not been paid and said it would be turned over to the ODC for action, which I did not understand. So I mailed you a check for the filing fee today and attached is a copy. Thank you for your understanding.

(footnote added). The check, number 093, was dated January 8, 2014, and was drawn on Mr. Kohout's new operating account with BB&T. The Court did not attempt to negotiate this check, requiring the filing fee be paid by cashier's check or money order.

Also on January 8, 2014, the Clerk's Office, at the direction of the Court, filed a disciplinary complaint against Mr. Kohout, directing that the ODC investigate the

---

[2] Mr. Kohout filed a motion to withdraw from the Big Bear action in the Circuit Court of Preston County on November 18, 2013. However, because his appeal with this Court was pending during that time, the circuit court lacked jurisdiction to address the motion.

circumstances surrounding the unpaid filing fee. That same day, by letter, ODC advised Mr. Kohout of the complaint. On January 10, 2014, Mr. Kohout responded to ODC, writing:

> My petition speaks for itself. . . . The Galfords came and picked up their file. The Galfords paid me $50 along with some of the other campers at Big Bear. That's all. That money was properly accounted for. . . . [T]he Galfords and the other campers failed and refused to continue to pay me for my time in working on this case. I sent them monthly letters urging them to pay, but we never heard back. . . . There's no dishonesty, deceit or misrepresentation. To my knowledge, an ethics case has never been based on one bounced check. . . .
>
> I have not engaged in any conduct prejudicial to the administration of justice. This is simply about one bounced check, unbeknownst to me, which I paid promptly. It has been paid and this matter is moot. There are no ethical violations here that can be proven.

On January 15, 2014, Mr. Kohout again wrote to the Court, including with the letter an "Official Check" dated January 15, 2014, for $200.00, processed through BB&T, to "pay the $200 filing fee." Mr. Kohout timely filed a brief in the case. The Court affirmed the circuit court's decision in *Galford v. Friend*, No. 13-1134, 2014 WL 5311389 (W. Va. Oct. 17, 2014) (memorandum decision).

During the investigation of this complaint, Mr. Kohout gave a sworn statement before the Investigative Panel of the LDB on March 27, 2014. During that statement, Mr. Kohout explained that none of the Big Bear property owners signed a fee agreement, and that he believed $50.00 per month from each person over the pendency of

7

the case "would be adequate to cover my time and any expert witnesses we needed, court reporter fees, things of that nature." Of the arrangement, he said, "[I]t was very informal." Mr. Kohout was questioned by Disciplinary Counsel regarding his contact with the Galfords prior to filing the appeal as follows:

> Q Did you speak to your clients before you filed [the notice of appeal]?
> . . . .
> A Well, I've had a lot of telephone conversations with the Galfords. I mean it was very informal. And with regard to the Galford case, I sent a letter to the campers and the Galfords every month, and you will see that.
> In fact, I attached a lot of those letters to my motion to withdraw from Galford and I said, "Look" -- I mean I've kept in copious touch with these people. Every month I told them what was going on with their case.
> So, the answer is, yes, I would have sent the Galfords a letter telling them that I had filed an appeal. Absolutely.[3]
> Q Well, you just said you sent a letter to them saying that you filed an appeal, but did you talk with them before you filed the appeal and that's what they wanted to do?
> A Well, I think I did. I don't recall specifically, but I would have talked to them and said, you know, "He's granted summary judgment. We should appeal this," you know. I mean, they left it up to me, basically. Yeah.
> Q So I'm assuming then that there is no -- you had no separate agreement --
> A No.
> Q --for a retainer agreement for payment to file an appeal?
> A No, there wasn't.
> Q You were just going to keep it the $50, that's what your intention was?

_____

[3] The record does not contain a letter from Mr. Kohout to the Galfords notifying them that an appeal had been filed in their case.

8

> A     Well, I really wasn't thinking about it at that point. I didn't think that far ahead.
>
> . . . .
>
> I didn't ask the Galfords -- I did not have a -- I don't have a specific recollection of a conversation with the Galfords about, "Hey, I'm going to file the appeal and it's $200."

(footnote added). Mr. Kohout's bank records indicate that he did not receive any payment from the Galfords to file the appeal.

In the Statement of Charges filed with the Court on September 25, 2015, the Investigative Panel of the LDB charged Mr. Kohout with violating Rules 1.1 ("Competence"),[4] 1.2(a) ("Scope of representation")[5] and 1.4(b) ("Communication")[6] for failing to discuss the objectives of the appeal with the Galfords such that the Galfords could make informed decisions regarding the representation, and for failing to obtain the

---

[4] Rule 1.1, titled "Competence," provides: "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."

[5] Rule 1.2, titled "Scope of representation," provides in subpart (a), in pertinent part, "A lawyer shall abide by a client's decisions concerning the objectives of representation . . . and shall consult with the client as to the means by which they are to be pursued. A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter."

[6] Rule 1.4, titled "Communication," provides, in full, "(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information. (b) A lawyer shall explain a matter to the extent necessary to permit the client to make informed decisions regarding the representation."

Galford's permission to file the appeal. The Investigative Panel determined that Mr. Kohout violated Rule 1.15(a) ("Safekeeping property"),[7] by failing to hold the legal fees paid to him by the Galfords and other Big Bear property owners in his client trust account. Finally, the Investigative Panel concluded that Mr. Kohout had violated Rule 8.4(c) and (d) ("Misconduct")[8] for having insufficient funds in his operating account with United Bank to cover the filing fee for the appeal, for failing to provide prior notice to the Galfords that he was filing an appeal, and for attempting to withdraw from representing the Galfords.

---

[7] Rule 1.15, titled "Safekeeping property," provides, in subparts (a) and (b):

> (a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account designated as a "client's trust account" in an institution whose accounts are federally insured and maintained in the state where the lawyer's office is situated, or in a separate account elsewhere with the consent of the client or third person. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.
>
> (b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

[8] Rule 8.4, titled "Misconduct," provides, that "[i]t is professional misconduct for a lawyer to . . . (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation[] [or] (d) engage in conduct that is prejudicial to the administration of justice[.]

10

In his answer to the Statement of Charges, filed October 9, 2015, Mr. Kohout denied each of these charges. He asserted, "The Galfords knew that I was filing an appeal and they will so testify at the hearing. . . . [W]e had a verbal agreement that I would have to be paid for my time. . . . The decision to file the appeal was the Galfords[']." With regard to the allegation that Mr. Kohout had mishandled his client's funds in violation of Rule 1.15, Mr. Kohout claimed,

> I did not fail to hold legal fees in my trust account and did not violate 1.15. This is ridiculous. I did a tremendous amount of work on the Big Bear case. Several of the property owners, and the Galfords, came to the hearings to watch. The money paid to me was not a retainer but it was fee money earned immediately for work I did. In fact, the value of my work far exceeded what little they paid me. If I'm guilty of anything in regards to the Big Bear case it's making the mistake of taking the case in the first place, given that the property owners group was awkward and difficult to work with.

Mr. Kohout further asserted, "I DID have sufficient fund[s] in the bank to cover the filing fee check when it was written. . . . I told [Disciplinary Counsel] that the reason the check bounced was because the Supreme Court held on to the check for six weeks before depositing it." Finally, he contended,

> The ODC just casts the facts in a slanted, incomplete and inaccurate way, and then sting [sic] cites Rule numbers without any explanation. The check was paid in January of 2014 and I was already punished by the Supreme Court by

11

being forced to file an appeal without pay.[9] So this entire Count is moot and should be dismissed.

(footnote added).

During the hearing before the HPS in January 2016, Mr. Kohout's former secretary, Vanessa Lawson, testified that she had opened the Court's December 11, 2013, letter regarding the first check sent to cover the Galfords' $200.00 filing fee. She said that after opening the letter, she placed the letter on Mr. Kohout's desk. She further claimed that at the time, Mr. Kohout said he would send the Court another check as soon as he had the money.

An investigator for the ODC, Bryan Selbe, testified at the hearing regarding Mr. Kohout's bank accounts. He asserted that he had examined Mr. Kohout's bank records and determined that at the time Mr. Kohout wrote the first check to pay the Galford's filing fee on October 29, 2013, the account on which the check was drawn carried a negative balance. The bank records included in the record show that on October 29, 2013, the same date marked on the check, Mr. Kohout's operating account with

---

[9] This Court takes exception to Mr. Kohout's assertion that this Court "punished" him by requiring him to file a brief in the Galfords' case. Mr. Kohout failed to comply with court rules, and as a direct result of that failure, he was not permitted to withdraw as counsel in the Galfords' case, and he remained responsible for adhering to the Court's scheduling order. Further, we observe that Mr. Kohout filed the appeal before requiring payment from the Galfords or any other Big Bear property owners.

United Bank was overdrawn in the amount of $2,665.44. As Mr. Selbe observed, the bank records show that while the operating account carried a positive balance from October 30, 2013, until November 17, 2013, the account was again overdrawn on November 18, 2013, and remained overdrawn through the attempts to negotiate the filing fee check. On or around December 14, 2013, Mr. Kohout abandoned the operating account with United Bank and opened a new operating account with BB&T.

Charles Galford also testified at the hearing. When asked whether he was aware that Mr. Kohout had filed an appeal in the case, Mr. Galford answered in the negative. He said that in the circuit court, following the dismissal of the suit, he was told that he had 30 days to get another attorney to which he said, "I'm not going to do it. I'm done with it."

With regard to the Galfords' case in circuit court, Mr. Kohout testified at the hearing that he did not keep an itemized statement of costs, stating, "There weren't really any costs other than the original filing fee. . . . [W]e really didn't have a lot of expenses. I mean my office expense, obviously, and Vanessa's time, you know, things of that nature . . . ." When asked what the $4,850.00 he had collected from the Big Bear property owners had been spent on, he said, "Well, it was fees. It was spent on general office expenses and rent and payrolls and everything else. It was paid as earned. I mean I did a lot of work on the case." Mr. Kohout testified that he did not keep track of his hours

13

and did not have an invoice for his time or expenses. Mr. Kohout insisted that he filed the appeal in the case at the direction of the Galfords.

In its report filed with the Court on June 3, 2016, the HPS determined that Mr. Kohout had committed the rule violations alleged in the Statement of Charges on the same grounds enunciated in the Statement of Charges.

**B. Complaint of Vanessa Lawson, No. 14-01-274**

Vanessa Lawson worked as Mr. Kohout's secretary from November 2010 until December 31, 2013. On December 31, 2013, she returned her keys to the office and left a note addressed to Mr. Kohout, writing, "So very sorry, but I cannot return to work. I also have creditors who are wanting money. I need a pay check every week and I am not sure what & when I will be paid. Thank you for the opportunity to work in this office." Upon discovering the note, Mr. Kohout wrote a letter to Ms. Lawson dated January 2, 2014, in which he stated, "You know from the past three years that we've always had occasional money problems, but we've always recovered. You could have talked to me about this." He also wrote, "As you know, you've borrowed money from me over the past few years. I need to know what your intentions are about paying this back."

On March 31, 2014, Ms. Lawson's mother, Judith Beal, filed suit against Mr. Kohout in the Magistrate Court of Monongalia County, alleging that she loaned him

14

$5000.00 on August 20, 2012, and that he had failed to repay her. On April 3, 2014, Mr. Kohout wrote to Ms. Lawson, stating, "I see that you've got your mother suing me for that money she gave me in the summer of 2012. How dare you! Please refer back to my letter to you of January 2. I lent you money and am demanding repayment immediately or else I'll sue you too."

Ms. Lawson submitted a complaint to the ODC dated May 16, 2014. In that complaint, Ms. Lawson alleged that Mr. Kohout had failed to repay a loan given to him by Ms. Beal, that he "[b]ounced four paychecks owed to me," that he "routinely avoids creditors and has bounced checks to (1) WV Supreme Ct.; (2) Mon Co. Circuit Court; (3) Malpractice Insurance Company (Wells Fargo)," that he "has also bounced checks to former employee, Kristen Taylor," and that he "has also submitted fraudulent Attorney's Charging Lien against client."[10] Finally, Ms. Lawson claimed that Mr. Kohout called her a disparaging term (i.e., "c**t"). It is not disputed that Mr. Kohout's former law clerk, Ronald Kramer, drafted Ms. Lawson's complaint and that she assented to its contents, adopting it as her own.

The ODC, by letter dated May 19, 2014, advised Mr. Kohout of Ms. Lawson's complaint and requested his response. He responded by letter dated May 22,

_____

[10] The attorney charging lien referenced here by Ms. Lawson is discussed in greater detail, *infra* Part I.D.

2014, characterizing Ms. Lawson's complaint as "a frivolous complaint brought by a disgruntled and spiteful former employee." He further claimed that "[n]o rule was violated," and that "there is no basis for any disciplinary action."

On November 10, 2014, Mr. Kohout filed a complaint against Ms. Lawson in the Magistrate Court of Monongalia County alleging that she had failed to repay loans he had made to her totaling $4,500.00. Mr. Kohout sought an additional $500.00 from Ms. Lawson for defamation and false charges of unethical conduct, seeking a total of $5,000.00 from Ms. Lawson. Ms. Lawson's answer to the complaint contended that the "loans" described by Mr. Kohout were in fact bonuses paid in connection with her work on cases that had settled.

The record in this case reflects that while the suit against Ms. Lawson was pending, the magistrate court entered a civil judgment order dated May 14, 2015, in Ms. Beal's case against Mr. Kohout. That case was decided in favor of Ms. Beal, and the court ordered Mr. Kohout to pay her $5,000.00. The court also ordered that Mr. Kohout pay court costs.

In his case against Ms. Lawson, Mr. Kohout submitted to the magistrate court a document dated September 7, 2011, with the subject line "RE: Bonus program." The document provided:

16

Vanessa, you have asked me to lend you money beyond your regular paycheck. I have therefore established a bonus program whereby when we settle a case you will get a percentage of the settlement as I determine based on the size of the settlement, and other financial needs of the office. This is entirely discretionary on my part and based upon good performance. It is understood that all such bonuses are to be considered loans to the firm and must be paid back i[f] you quit or are terminated for cause within the first five years of employment, in keeping with the practices of other companies. In other words, your bonuses will vest after five years of continuous employment and are being offered as an incentive for good loyal performance.

Ms. Lawson's signature appears on the document, although she denied signing it and claimed that the first time she ever saw the document was during the proceedings in magistrate court. Ms. Lawson testified that when she began working for Mr. Kohout, he told her she would receive bonuses. The record shows that on July 21, 2015, the magistrate court ruled in favor of Ms. Lawson, entering a civil judgment order dismissing Mr. Kohout's claims against her.

In the September 25, 2015, Statement of Charges, the Investigative Panel of the LDB found that the checks Mr. Kohout described as "loans" were actually bonus checks given to Ms. Lawson after case settlements. The Investigative Panel observed that the checks corresponded to checks written to clients whose cases had settled. Based on these findings, the Investigative Panel determined that Mr. Kohout's suit to recover the $4,500.00 in bonus payments lacked merit and was intended only to harass Ms. Lawson. The Investigative Panel concluded that this conduct violated Rules 3.1 ("Meritorious

17

claims and contentions")[11] and 8.4(c) and (d) ("Misconduct").[12] The Investigative Panel did not determine that Mr. Kohout violated any other Rules with regard to the allegations raised in Ms. Lawson's complaint.

In its June 3, 2016, report, the HPS agreed with the findings and conclusions of the Investigative Panel as set forth in the Statement of Charges. The HPS also found that Mr. Kohout violated Rule 5.4(a) ("Professional independence of a lawyer"),[13] which prohibits a lawyer from sharing legal fees with a nonlawyer except

---

[11] Rule 3.1, titled "Meritorious claims and contentions," provides, in pertinent part, that "[a] lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous."

[12] *See supra* note 8 and accompanying text.

[13] Rule 5.4, titled "Professional independence of a lawyer," provides, in part:

> (a) A lawyer or law firm shall not share legal fees with a nonlawyer, except that:
> (1) an agreement by a lawyer with the lawyer's firm, partner or associate may provide for the payment of money, over a reasonable period of time after the lawyer's death, to the lawyer's estate or to one or more specified persons;
> (2) a lawyer who undertakes to complete unfinished legal business of a deceased lawyer may pay to the estate of the deceased lawyer that proportion of the total compensation which fairly represents the services rendered by the deceased lawyer;
> (3) a lawyer or law firm purchasing the practice of a deceased, disabled or disappeared lawyer may, pursuant to the provisions of Rule 1.17, pay to the estate or other representative of that lawyer an agreed-upon purchase price; and

(continued . . .)

under limited circumstances not present in this case, by sharing legal fees with Ms. Lawson.

### C. Complaint of Sonja Richard, No. 14-01-301

On May 15, 2013, Ms. Richard retained Mr. Kohout to represent her in a personal injury matter, signing a fee agreement, which provided as follows:

> The attorney's fee for representing client shall be one-third (33.33%) of any funds recovered from the case, plus reimbursement of expenses associated with same.
> . . . .
> . . . Client shall pay all costs and expenses incurred in and about the institution and prosecution of said suit or claim.
> . . . .
> . . . Client does hereby authorize attorney, at attorney's sole option, to withhold and pay from any sums received by way of settlement or otherwise in the prosecution of the claim:
> a. Attorney's fee herein provided;
> b. Any costs or expenses not yet reimbursed to attorney;
> c. Any amounts owed by client for doctor or hospital bills;
> d. Any other obligations owed by client arising out of the controversy for which attorney was employed.

On that same date, Mr. Kohout sent a letter to Dynamic Physical Therapy, writing, "I represent [Sonja Richard] in a personal injury case for which you have seen her. Please

---

(4) a lawyer or law firm may include nonlawyer employees in a compensation or retirement plan, even though the plan is based in whole or in part on a profit-sharing arrangement.

accept this letter and a guarantee of payment from any settlement from this case. If you need further information feel free to contact me."

Ms. Richard's case settled on October 30, 2013, for $35,000. The next day, Mr. Kohout provided Ms. Richard with $20,000 from the settlement, along with a document titled "Settlement Disbursement." The Settlement Disbursement document explained the disbursement of the settlement funds as follows:

1. Check from insurance company $35,000.
2. Given to client per agreement $20,000.
3. Attorney fees and expenses $15,000.

Ms. Richard signed the document.

Ms. Richard filed a complaint with the ODC on June 3, 2014, alleging that Mr. Kohout had failed to pay her medical bill with Dynamic Physical Therapy, which totaled $985.00. Although she said that she contacted him multiple times about the unpaid bill, she claimed, "Mr. Kohout kept the money to pay it out of the settlement and a couple thousand more th[a]n the agreed amount after I added it up and realized he did get more th[a]n he should have." The ODC forwarded the complaint to Mr. Kohout on June 18, 2014.

In his June 23, 2014, response to the complaint, Mr. Kohout stated, "I deny her scandalous charges in full." He claimed that pursuant to the fee agreement, he was

entitled to one third of the settlement proceeds plus reimbursement of expenses. He asserted,

> My expenses include[] the filing [f]ee and service of process $275, her bill to Dynamic $985, the cost of obtaining her hospital records from Fairmont General $14.84, and my office expense. . . . This case took a great deal of my time so my fee and expenses were necessary and reasonable under Rule 1.5.
>
> I did agree to guarantee payment to Dynamic Physical Therapy so that they would agree to treat her. The bill is $985. To date I have not been billed by them. I never refused to pay it and I am holding that money to pay it when they contact me.

Mr. Kohout also made claims regarding Ms. Richard's character, including claiming that Ms. Richard had a criminal history, and that by filing a complaint, Ms. Richard "was just trying to extort money from" him.

In its September 15, 2015, Statement of Charges, the Investigative Panel of the ODC asserted:

> Upon information and belief, 33.33% of the settlement in this matter is approximately $11,665.50. The "Settlement Disbursement," however, indicates that [Mr. Kohout]'s "attorney fee and expenses" totaled $15,000.00. While the "Settlement Disbursement" does not itemize [Mr. Kohout]'s expenses, in his verified response, he claimed expenses in the amounts of $275.00, $985.00, and $14.84 leaving a balance of $3,334.50 in unnamed "office expenses."
> . . . On or about October 30, 2013, [Mr. Kohout] deposited Complainant Richard's $35,000.00 settlement check into his United Bank "Client Trust Account."
> . . . On or about October 30, 2013, [Mr. Kohout] wrote a check from his "Client Trust Account" in the amount of $20,000.00 as payment to Complainant Richard. There are no

21

checks reflecting payment of "Attorney fees and expenses" from [Mr. Kohout]'s United Bank "Attorney at Law" [operating] account rather on the same date, [Mr. Kohout] made two "Internet/Phone Trans" from his United "Client Trust Account to his United Bank "Attorney at Law" account in the amounts of $3,000.00 and $12,000.00, purportedly representing his "Attorney's fees and expenses." On the day prior to the "Internet/Phone" transfer, the balance in [Mr. Kohout]'s United Bank "Attorney at Law" account was negative $2,665.44.

. . . .

. . . According to the December 12, 2013 bank statement for [Mr. Kohout]'s United Bank "Attorney at Law" account . . . [Mr. Kohout]'s ending balance on or about December 12, 2013, was negative $1,741.11. The balance in [Mr. Kohout]'s United Bank "Attorney at Law" account had a negative balance only eighteen (18) days after the October 30, 2013 "Internet/Phone" transfer.

The Investigative Panel determined that Mr. Kohout violated Rule 1.4 ("Communication") for failing to keep Ms. Richard "reasonably informed about the status of the payment of the Dynamic Physical Therapy bill" and for failing "to promptly comply with her reasonable requests for information about the status of the payment of the medical bill." Additionally the Investigative Panel concluded that Mr. Kohout charged an unreasonable fee in violation of Rule 1.5(a) ("Fees"),[14] and that he violated

---

[14] Rule 1.5, titled "Fees," provides, in part:

    (a) A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:
    (1) the time and labor required, the novelty and difficulty of the questions involved, and skill requisite to perform the legal service properly;
    (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(continued . . .)

Rule 1.15(a) and (b) ("Safekeeping property")[15] by failing to promptly pay the Dynamic Physical Therapy bill, for failing to hold the money to pay that bill in a client trust account, and by failing to provide a full accounting of the money withheld from the settlement. According to the Investigative Panel, Mr. Kohout "wrongfully misappropriated and converted client funds and/or funds due his client and/or to a third person to his own personal use" in violation of Rule 8.4(c) and (d) ("Misconduct"). Finally, the Investigative Panel concluded that Mr. Kohout violated Rule 8.1(b) ("Bar admission and disciplinary matters")[16] by knowingly making a false statement of material

---

> (3) the fee customarily charged in the locality for similar legal services;
> (4) the amount involved and results obtained;
> (5) the time limitations imposed by the client or by the circumstances;
> (6) the nature and length of the professional relationship with the client;
> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
> (8) whether the fee is fixed or contingent.

[15] *See supra* note 7 and accompanying text.

[16] Rule 8.1, titled "Bar admission and disciplinary matters," provides, in relevant part, that

> a lawyer . . . in connection with a disciplinary matter, shall not:
> (a) knowingly make a false statement of material fact; or
> (b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority, except that this rule does not require disclosure of information otherwise protected by Rule 1.6.

fact in connection with the disciplinary matter by claiming in his response to the complaint that he was "holding" the money to pay the Dynamic Physical Therapy Bill.

In October 2015, Mr. Kohout contacted Dynamic Physical Therapy about paying Ms. Richard's bill. He paid the bill in December 2015.

During the hearing before the HPS held in January 2016, Ms. Richard, when asked whether she had any discussions with Mr. Kohout about increasing his fee after she signed the fee agreement, she answered, "No, never." On that same issue, Mr. Kohout was questioned by one of the members of the HPS regarding Ms. Richard's allegations as follows:

> MS. AMBROSE: . . . If the terms are already on paper that this is what we're going to do, why would you kind of bump up your fee a little bit, just because she threw a number out and thought she was getting only $20,000? Do you see what I'm saying?
> . . . .
> It looks a little like you're taking advantage of that situation and paying yourself a little bit more knowing that she might not complain about it. . . .
> . . . .
> [MR. KOHOUT]: . . . Well, a couple of things, a couple of factors there for why that was done. One, I was in serious financial trouble. I mean the bank account was underwater before that money was put in the account at the end of October. And, two, I thought that I deserved it because the case turned out a lot better than I would've expected it to. I never really expected they would go to $35,000. I mean when we got over 20, I started to get excited. So, you know, I -- and I discussed it with Sonya [sic]. She said -- she turned to me and said "Well, how much will I get?" I said "Twenty".

24

> She was happy with that. I thought we had a modification to our fee agreement. I mean could I have explained it to her better? Could I have done the math for her? Yes. I mean did I make mistakes in handling that? Absolutely.
>
> MS. AMBROSE: Because it's a contract and any modification should be done in writing?
>
> [MR. KOHOUT]: Yeah. Absolutely. And I mishandled it and I admit to that and I feel bad about it and I told her that, you know, yesterday. . . .

Mr. Kohout testified that his office expenses in connection with Ms. Richard's case consisted of "secretarial time, copies, phone calls, things of that nature, supplies," although he admitted that he did not itemize his expenses.

On the issue of the Dynamic Physical Therapy bill, Ms. Richard testified that she was physically present in his office when Dynamic Physical Therapy faxed the bill to his office on July 12, 2013. An employee of Dynamic Physical Therapy, Teresa Johnson, testified that she called Mr. Kohout's office about the bill on March 17, 2014; April 10, 2014; and May 19, 2014. Mr. Kohout admitted that he received the bill on July 12, 2013, and that he did not pay the bill until December 2015.

In its report, the HPS determined that Mr. Kohout violated Rules 1.4 (a) and (b) ("Communication"), 1.5 ("Fees"), 1.15(a) and (b) ("Safekeeping property"), and 8.4(c) and (d) ("Misconduct") on the same grounds as those listed in the Statement of

25

Charges. The HPS also concluded that Mr. Kohout violated Rule 1.3 ("Diligence")[17] for failing to act with reasonable diligence in paying the Dynamic Physical Therapy bill and Rule 8.1(a) ("Bar admission and disciplinary matters")[18] for making a false claim that he was "holding" the money to be paid to Dynamic Physical Therapy. The HPS did not find a violation of Rule 8.1(b) ("Bar admission and disciplinary matters").

### D. Complaint of Ronald G. Kramer, II, No. 14-01-382

Mr. Kohout employed Mr. Kramer as a part-time law clerk from February 2012 to April 2013 while Mr. Kramer attended law school. At Mr. Kramer's request, Mr. Kohout represented him in a suit arising from a defect in his vehicle, and a complaint was filed in the case in April 2013. There is no dispute that the representation was by oral agreement; they did not enter into a written fee agreement. By letter dated January 6, 2014, Mr. Kramer asked Mr. Kohout to withdraw as counsel, and Mr. Kohout withdrew from the representation by order entered January 14, 2014. Thereafter, Mr. Kohout filed a "Notice of Attorney's Charging Lien" in which he claimed Mr. Kramer owed him $14,269.00 for work on the case. Mr. Kramer disputed the amount owed.

---

[17] Rule 1.3, titled "Diligence," provides, "A lawyer shall act with reasonable diligence and promptness in representing a client."

[18] *See supra* note 16 and accompanying text.

By order entered July 22, 2014, the Circuit Court of Monongalia County dismissed Mr. Kramer's suit following the parties' agreement to settle the case for $5,000.00. The order also provided that although Mr. Kramer and Mr. Kohout "expressed alternate views on the contents of the oral contract," Mr. Kohout was entitled to payment of one-third of the settlement amount, $1,666.66, as the "fair amount for Mr. Kohout's attorney's fees as one-third is a standard contingency fee arrangement." The circuit court concluded that payment of $1,666.66 would satisfy the charging lien.

Mr. Kramer submitted a complaint with the ODC dated July 15, 2014, wherein he alleged that, in connection with the representation, Mr. Kohout failed to communicate settlement offers to him, that Mr. Kohout "submitted a fraudulent lien to court documenting hours and expenses that were knowingly false," and that Mr. Kohout sent "vulgar and unprofessional text messages" to him. The ODC forwarded the complaint to Mr. Kohout on July 18, 2014, and Mr. Kohout responded to the ODC's communication in an answer dated July 21, 2014. In his answer, Mr. Kohout contended that Mr. Kramer's complaint was "completely frivolous," and he denied any unethical conduct.

In the September 25, 2015, Statement of Charges, the Investigative Panel of the LDB determined that the "Invoice for Legal Services" accompanying the Notice of

Attorney's Charging Lien was fraudulently submitted in Mr. Kramer's case in violation of Rule 8.4(c) and (d) ("Misconduct").

At the hearing before the HPS on January 25 and 26, Mr. Kramer testified that he had drafted most of the court filings in his case. Mr. Kohout testified he disagreed with all of Mr. Kramer's testimony. When asked if there were "instances where Mr. Kramer prepared the pleadings, and then you filed them," Mr. Kohout responded, "He worked on the complaint, the original complaint, and that's all he did. . . . So that's not true that Ron [Kramer] told you yesterday that he did all the work. That is absolutely not true." This testimony is supplemented by email correspondence in the record between Mr. Kramer and Mr. Kohout. In two separate emails, Mr. Kohout acknowledges receipt of an amended complaint drafted by Mr. Kramer and discovery documents drafted by Mr. Kramer. One of the two emails indicates that Mr. Kohout received a discovery document drafted by Mr. Kramer that he filed "exactly as [Mr. Kramer] wrote it."

The HPS concluded that Mr. Kohout violated Rule 8.4(c) and (d) by submitting a fraudulent invoice for his services to the circuit court. The HPS supported this determination with findings that Mr. Kramer "maintained at the hearing that he drafted the pleadings in his case, including the complaint, discovery responses, and responses to dispositive motions," and that Mr. Kramer "testified that he gave at least one of his pay checks back to [Mr. Kohout] to pay for the filing fee in his case."

28

**E. Recommended Sanctions**

The HPS determined that Mr. Kohout's conduct violated duties to his clients, to the public, to the legal system, and to the legal profession; that he acted intentionally and knowingly; and that the amount of real injury is great. The HPS also observed that presence of several aggravating factors and the absence of any mitigating factors. The HPS set forth the aggravating factors as follows: "(1) prior disciplinary offenses; (2) dishonest or selfish motive; (3) a pattern of misconduct; (4) multiple offenses; (5) refusal to acknowledge wrongful nature of conduct; (6) substantial experience in the practice of law; and (7) indifference to making restitution."

With regard to prior discipline, the HPS noted that by the decision of this Court in *Lawyer Disciplinary Board v. Kohout*, No. 22629 (W. Va. Apr. 14, 1995) (per curiam), Mr. Kohout's law license was suspended for two years for making a materially false statement in connection with his application for admission to the West Virginia State Bar; for engaging in conduct involving dishonesty, fraud, deceit, or other misrepresentation by repeatedly concealing the fact that he had attended and been suspended from a law school in Alabama; and for deception before the Bankruptcy Court for the Northern District of West Virginia. The Court concluded that Mr. Kohout "engaged in serious ethical misconduct and has demonstrated a pattern of conduct

29

involving intentional deception." *Id.* at \*8.[19]  Mr. Kohout was also suspended from the practice of law in the Bankruptcy Court for the Northern District of West Virginia for three years. After a reinstatement proceeding, Mr. Kohout's law license was reinstated by order of this Court entered March 24, 2005. Subsequently, in May 2013, Mr. Kohout was admonished by the Investigative Panel of the LDB on May 6, 2013, for misleading a family court as to the status of a personal injury settlement received by his client.

Based on the foregoing, the HPS's report concludes that Mr. Kohout's violations of the Rules

> are extremely egregious and touch the very essence of the public's perception of the legal profession. The most serious among the many charges against [Mr. Kohout] are misappropriation and conversion of funds belonging to his client and a medical provider and misrepresentation. It is the recommendation by the Office of Disciplinary Counsel, and a recommendation supported by factual findings by the Hearing Panel Subcommittee that [Mr. Kohout]'s law license should be annulled because it is the only sanction that will adequately protect the public[.]

The HPS recommends (1) that Mr. Kohout's law license be annulled, (2) that Mr. Kohout be required to make full restitution to Ms. Richard in the amount of $2,059.66, and (3) that Mr. Kohout be ordered to pay the costs of the disciplinary proceedings.

---

[19] Mr. Kohout's license to practice law in Pennsylvania was suspended following the suspension of his law license in West Virginia.

## II.  STANDARD OF REVIEW

The LDB is responsible for investigating complaints alleging violations of the West Virginia Rules of Professional Conduct. W. Va. Rules of Lawyer Disciplinary Procedure 1. The HPS of the LDB "conduct[s] hearings and make[s] findings of fact, conclusions of law, and recommendations of lawyer discipline to the Supreme Court of Appeals on formal charges." W. Va. Rules of Lawyer Disciplinary Procedure 3. "In order to recommend the imposition of discipline of any lawyer, the allegations of the formal charge must be proved by clear and convincing evidence." W. Va. Rules of Lawyer Disciplinary Procedure 3.7; *see also* syl. pt. 1, *Lawyer Disciplinary Bd. v. McGraw*, 194 W. Va. 788, 461 S.E.2d 850 (1995) ("Rule 3.7 of the Rules of Lawyer Disciplinary Procedure, effective July 1, 1994, requires the Office of Disciplinary Counsel to prove the allegations of the formal charge by clear and convincing evidence." (in part)).

Although the LDB may make recommendations based on its investigations, "[t]his Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syl. pt. 3, *Blair*, 174 W. Va. 494, 327 S.E.2d 671. This Court's standard of review, as set forth in syllabus point 3 of *Committee on Legal Ethics v. McCorkle*, 192 W. Va. 286, 452 S.E.2d 377 (1994), provides:

> A *de novo* standard applies to a review of the adjudicatory record made before the [Lawyer Disciplinary Board] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this

Court gives respectful consideration to the [Board's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the [Board's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record.

## III. ANALYSIS

The ODC asserts that the evidence in the record supports the HPS's findings of fact and conclusions of law, and it urges this Court to adopt the sanctions recommended by the HPS. Mr. Kohout does not dispute the HPS's findings with regard to the complaint of Sonja Richard, No. 14-01-301. However, with regard to the complaint of the ODC, No. 14-01-015, while he "acknowledges that the return of his check for insufficient funds . . . did not reflect on the professionalism proscribed [sic] by the Rules," he denies having engaged in the misconduct described by the HPS. He further denies having engaged in misconduct described by the HPS with regard to the complaints of Ms. Lawson and Mr. Kramer, Nos. 14-01-274 and 14-01-382, respectively. As to the Rules he concedes he violated, Mr. Kohout claims that they do not warrant the sanctions recommended by the HPS.

### A. Disputed findings and conclusions

Mr. Kohout first argues that the HPS erred in concluding that he violated Rule 8.4(c) and (d) by submitting a check to the Court Clerk that was denied for insufficient funds. He asserts that this determination is not sustained by the evidence. In

32

support of his position, he quotes *Committee on Legal Ethics v. Taylor*, 187 W. Va. 39, 415 S.E.2d 280 (1992), in which we said,

> Where an attorney writes a worthless check under circumstances that demonstrate dishonesty or misrepresentation . . . or conduct that adversely reflects on fitness to practice law . . . , disciplinary punishment is warranted. It should be shown that the attorney was either aware that the check was worthless when it was written or failed to make it good within a reasonable period of time after the attorney was aware the account had insufficient funds.

Syl. pt. 3, *id.*

Mr. Kohout's bank records show that his operating account carried a negative balance on the day check number 3149 was written. Thus, it is clear that the check was worthless when written. Although money was deposited into that account exceeding the value of the check the day after the check was written, the account again carried a negative balance prior to the attempts to negotiate the check, making the check worthless. We are concerned with Mr. Kohout's assertions that he did not know about the denial of the check for insufficient funds until Ms. Gaiser contacted him on January 8, 2014. Even if he had not received the December 11, 2013, letter regarding the denial of the check, as he asserts, he has at best established a complete failure to stay apprised of the status of his operating account such that he may timely correct issues connected therewith. We are particularly concerned with Mr. Kohout's repeated representations during these proceedings that his account contained sufficient funds when the check was written, despite the fact that his bank records clearly reflect otherwise. Although he has

33

now retreated from those representations, his assertions evince a dishonest motive. Therefore, we determine that the HPS correctly concluded that Mr. Kohout violated Rule 8.4(c) and (d) by submitting check number 3149 to the Court Clerk.

Mr. Kohout also argues that the HPS erred in concluding that he violated Rule 8.4(c) and (d) by failing to provide notice to the Galfords that he was filing an appeal with the Supreme Court and for attempting to withdraw from representation of the Galfords' in their appeal to the Court. Upon our examination of the record, we determine that the HPS's conclusion that Rule 8.4(c) and (d) was violated is supported by clear and convincing evidence. Mr. Galford testified that he did not authorize Mr. Kohout to file the appeal, and that after the case was dismissed in the circuit court, he did not have any interest in appealing the decision. Mr. Kohout did not enter into a written representation agreement with the Galfords. Mr. Kohout's own letter to the Galfords and other Big Bear property owners, dated October 21, 2013, asserted that he would not file an appeal unless he received "payment of at least $3,000 up front," yet Mr. Kohout's bank records indicate that he did not receive any payments from the Galfords that might be associated with the appeal. Mr. Kohout testified that he would have sent the Galfords a letter to inform them that he had filed an appeal as a matter of course, but no such letter exists in the record. In fact, after filing the appeal, the only documentation in the record showing any communication between himself and the Galfords involves his withdrawal from the case. Moreover, Mr. Kohout's brief to this Court admits, "[D]espite his efforts, he had not

34

received clear word from his clients regarding their intent or desire to appeal." We also observe that in his response to the ODC's complaint, he misrepresented the amount the Galfords paid him in connection with the representation, stating that he had received $50.00 instead of the greater sum of $400.00 that he actually collected.

The forgoing evidence, which establishes a violation of Rule 8.4(c) and (d) ("Misconduct"), is equally probative in establishing that he violated Rules 1.1 ("Competence"), 1.2(a) ("Scope of representation"), and 1.4(b) ("Communication"). However, while Mr. Kohout's attempt to withdraw from representation of the Galfords before this Court did not comply with the Court's rules for doing so, we agree with Mr. Kohout's position that this conduct does not rise to misconduct under the Rules.

Mr. Kohout also attacks the HPS's conclusion that he violated Rule 1.15(a) ("Safekeeping of Property") by failing to hold fees paid in advance by the Galfords and other Big Bear property owners separate from his own property. He claims in his brief, as he has throughout these disciplinary proceedings, that he was "paid as the case progressed and that no one involved in the matter provided a retainer or paid in advance." Mr. Kohout's September 22, 2012, letter to the Big Bear property owners directly contradicts this assertion. In that letter, he acknowledged, "Some of you have sent me money for a retainer fee . . . ." Mr. Kohout later testified that all of the money he received from the Big Bear property owners was placed into his operating account, not a client

35

trust account. In sum, the record establishes that Mr. Kohout *did* receive fees paid in advance by the Big Bear property owners and that he failed to hold those fees separate from his own property, all in violation of Rule 1.15(a).[20]

With regard to Ms. Lawson's complaint, Mr. Kohout states that the HPS's determination that he violated Rules 3.1 ("Meritorious claims and contentions") and 8.4(c) and (d) by filing a lawsuit against Ms. Lawson for the return of "loans" is not supported by the evidence. Mr. Kohout produced a document dated September 7, 2011, providing that Ms. Lawson would receive bonuses she would be responsible for paying back to Mr. Kohout if she left or was terminated from her employment within five years. Ms. Lawson denied having seen the document prior to the lawsuit in magistrate court, she denied having signed it, and she testified that when she began working for Mr. Kohout, he told her she would receive bonuses as part of her compensation. The magistrate court resolved the matter in favor of Ms. Lawson. While the evidence may have been sufficient for the magistrate court to determine, by a preponderance of the evidence, that Mr. Kohout was not entitled to that which he claimed, and while we do believe it is an

_____

[20] Mr. Kohout's records, along with his testimony, are troubling. He did not keep any accounting of the work he performed in the case or his expenses, yet he contends that he earned the entire $4,850.00 he collected from the Big Bear property owners. In a letter to the Big Bear property owners, he asserted that he would retain one-third of any recovery in the case as a contingent fee. He retained the entire sum paid to him despite there being no recovery in the case. While this raises many questions for the Court, the facts were not properly developed below for us to determine whether this conduct constituted a violation of the Rules.

interesting coincidence that Mr. Kohout sought from Ms. Lawson the exact sum Ms. Beal sought from Mr. Kohout, we cannot conclude that the record contains clear and convincing evidence that Mr. Kohout's lawsuit against Ms. Lawson lacked merit. Thus, we agree with Mr. Kohout's position that evidence was insufficient to support a determination that he violated Rules 3.1 and 8.4(c) and (d) for filing his suit against Ms. Lawson.

Mr. Kohout further asserts that the record does not support the HPS's determination that he violated Rule 5.4(a) ("Professional independence of a lawyer"). He argues that the "loans" he provided to Ms. Lawson constituted compensation permitted under the Rule.[21] To the extent that we cannot determine whether the disputed funds given to Ms. Lawson constitute compensation by clear and convincing evidence, we cannot find that Mr. Kohout violated this rule.

---

[21] Mr. Kohout's brief directs the Court to Rule 5.4(a)(3), stating that this rule "specifically permits compensation of non-lawyer employees." That rule, however, does not address the compensation of non-lawyer employees; the rule permits a lawyer to purchase the law firm of a deceased, disabled, or disappeared lawyer and pay the estate or other representative of the lawyer. *See supra* note 13 and accompanying text. We believe Mr. Kohout may have intended to refer to Rule 5.4(a)(4), the text of which appears verbatim in the version of Rule 5.4(a)(3) that is currently in force, which permits a lawyer to include a nonlawyer employee in a compensation plan that is based on a profit-sharing arrangement. *Id.*

Finally, Mr. Kohout challenges the HPS's determination that he violated Rule 8.4(c) and (d) ("Misconduct") by submitting a fraudulent invoice for legal services with his Notice of Attorney's Charging Lien with regard to his representation of Mr. Kramer. Despite Mr. Kohout's testimony to the contrary, email correspondence included in the record shows that he acknowledged receipt of a discovery document drafted by Mr. Kramer and his assertion that it would be filed exactly as it was written. We find that based on the evidence in the record, there is clear and convincing evidence that Mr. Kohout submitted a lien asserting he was owed money for work that he did not perform. Thus, the HPS's conclusion that Mr. Kohout violated Rule 8.4(c) and (d) is justified by the evidence.

## B. Sanctions

We now turn to deciding the appropriate sanctions to be imposed. The ODC asserts that based upon Mr. Kohout's misconduct, annulment is the appropriate sanction in this matter. Mr. Kohout disagrees, arguing that annulment is not warranted and is not proportional to the harm Mr. Kohout caused.

We have held, "This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syl. pt. 3, *Blair*, 174 W. Va. 494, 327 S.E.2d 671.

Like the HPS, when deciding on an appropriate sanction, the Court must consider the factors set forth in Rule 3.16 of the Rules of Professional Conduct:

> (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors.

*Accord* syl. pt. 4, *Office of Lawyer Disciplinary Counsel v. Jordan*, 204 W. Va. 495, 513 S.E.2d 722. In examining these factors, we keep in mind that "attorney disciplinary proceedings are primarily designed to protect the public, to reassure it as to the reliability and integrity of attorneys and to safeguard its interest in the administration of justice." *Comm. on Legal Ethics v. Keenan*, 192 W. Va. 90, 94, 450 S.E.2d 787, 791 (1994). Furthermore,

> [i]n deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession.

Syl. pt. 3, *Comm. on Legal Ethics v. Walker*, 178 W. Va. 150, 358 S.E.2d 234 (1987).

The behavior we find most disturbing is the behavior in which Mr. Kohout admits engaging: the conversion of funds from Ms. Richard's settlement. First, he moved the funds intended for Dynamic Physical Therapy from his client trust account to his operating account, comingling the funds of a third person with his own. His bank records,

39

which show that he then overdrew the operating account without paying Dynamic Physical Therapy, establish that he converted the sum of the bill to his own use. *See Lawyer Disciplinary Bd. v. Kupec*, 202 W. Va. 556, 569, 505 S.E.2d 619, 632 (1998) ("Conversion is the unauthorized use of entrusted funds for the lawyer's own purpose. It includes temporary use."). More than six months later the bill had still not been paid, prompting Ms. Richard to file a complaint with the LDB. In response to the complaint Mr. Kohout lied, asserting that he had not received a bill from Dynamic Physical Therapy. Mr. Kohout finally paid the bill more than two years after the settlement funds had been disbursed. It is obvious that Mr. Kohout was retaining the money to keep his law office afloat during a tough financial time.

Second, Mr. Kohout wrongfully retained $2,059.66 of Ms. Richard's portion of the settlement of her case, converting those funds to his own use. Before the HPS, he testified that he and Ms. Richard had orally modified the original fee agreement to permit him to retain the funds. The record, along with Ms. Richard's testimony, shows that no modification took place. We find his assertion in his brief to this Court that he simply "renegotiat[ed] his share of the settlement agreement without discussing the matter with Ms. Richard in greater detail," to be thoroughly disingenuous. To date, Mr. Kohout still retains the $2,059.66.

This Court adheres to "the general rule that absent compelling extenuating circumstances, misappropriation or conversion by a lawyer of funds entrusted to his/her care warrants disbarment." *Id.* Mr. Kohout has not given us a remotely compelling reason to deviate from our general rule. His wrongful behavior with regard to Ms. Richard and Dynamic Physical Therapy, coupled with his dishonest dealings with the Galfords, Mr. Kramer, the ODC, and this Court, leave us with no doubt that Mr. Kohout's law license must be annulled. Through his unethical conduct, he has violated duties owed to a number of his clients—the Galfords, Ms. Richard, and Mr. Kramer—and to a third party, Dynamic Physical Therapy. The evidence presented in this case shows that he acted intentionally, knowingly, and with a dishonest motive. The amount of actual injury in this case is great; Mr. Kohout still retains thousands of dollars that should have been disbursed to Ms. Richard over three years ago. By failing to pay the Dynamic Physical Therapy bill when due, Mr. Kohout also put Ms. Richard's credit at risk. Additionally, his conduct reflects poorly on the legal profession.

We further find that this case presents a slew of aggravating factors. "Aggravating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify an increase in the degree of discipline to be imposed." Syl. pt. 4, *Lawyer Disciplinary Bd. v. Scott*, 213 W. Va. 209, 579 S.E.2d 550 (2003). We agree with the findings of the HPS and observe that the following aggravating factors exist in this case: (1) Mr. Kohout's list of prior disciplinary offenses, one of which necessitated

41

suspension of Mr. Kohout's law license for two years; (2) his dishonest and/or selfish motive; (3) the extensive number of Rule violations; (4) a pattern of misconduct as established by his prior discipline and the present Rule violations; (5) refusal to acknowledge the wrongful nature of his conduct or the extent of the harm caused by his conduct; (6) his substantial experience in the practice of law; and (7) his indifference to making restitution. We note also that since the HPS submitted its report, Mr. Kohout has been found, by order of this Court entered on October 7, 2016, to have violated multiple canons of the Code of Judicial Conduct. The order permanently enjoins him from seeking judicial office by election or appointment in West Virginia.

We also agree with the HPS's finding that no mitigating factors are present in this case. We have held that "[m]itigating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify a reduction in the degree of discipline to be imposed." Syl. pt. 2, *id.*

> Mitigating factors which may be considered in determining the appropriate sanction to be imposed against a lawyer for violating the Rules of Professional Conduct include: (1) absence of a prior disciplinary record; (2) absence of a dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith effort to make restitution or to rectify consequences of misconduct; (5) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (6) inexperience in the practice of law; (7) character or reputation; (8) physical or mental disability or impairment; (9) delay in disciplinary proceedings; (10) interim rehabilitation; (11) imposition of other penalties or sanctions; (12) remorse; and (13) remoteness of prior offenses.

42

Syl. pt. 3, *id.*

First, Mr. Kohout argues that we should consider his payment of the Dynamic Physical Therapy bill as a "timely good faith effort to make restitution." We decline to do so. The record establishes that he did not timely pay the bill. Additionally, he has still not made restitution to Ms. Richard for the money he wrongfully retained from her settlement. We have also recognized that "[r]estitution is not a defense" to misappropriation or conversion. *Kupec*, 202 W. Va. at 569, 505 S.E.2d at 632.

Second, Mr. Kohout contends that during the timeframes at issue in the complaints, he "was experiencing personal and emotional problems that detrimentally affected his judgment," and that these problems should be considered a mitigating factor. Again, we decline to do so. As we recently stated, "While we understand that sometimes a lawyer's personal problems require the lawyer's utmost attention, this focus of a lawyer's attention cannot come at the client's expense." *Lawyer Disciplinary Bd. v. Sturm*, 237 W. Va. 115, ___, 785 S.E.2d 821, 834 (2016). Furthermore, while he claims to have suffered "emotional problems," he has not alleged that his problems amount to a mental disability that could be considered a mitigating factor. *See* syl. pt. 3, *Lawyer Disciplinary Bd. v. Dues*, 218 W. Va. 104, 624 S.E.2d 125 (2005) ("In a lawyer disciplinary proceeding, a mental disability is considered mitigating when: (1) there is medical evidence that the attorney is affected by a mental disability; (2) the mental

43

disability caused the misconduct; (3) the attorney's recovery from the mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and (4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely.").

Third, in his brief to this Court, he claims that he has provided "[F]ull and free disclosure to the disciplinary board," and that this action should be considered a mitigating factor. While his responses to the ODC were prompt, the record reflects that his disclosures were less than "full and free," making multiple false statements to the ODC and ultimately this Court.

Fourth, Mr. Kohout asserts that he has shown remorse. While he has apologized to Ms. Richard for not timely paying the bill to Dynamic Physical Therapy, he has shown no remorse for wrongfully retaining $2,059.66 from her settlement or for the numerous other violations of the Rules he has committed.

Fifth and finally, he argues that the remoteness of his prior offenses should act as a mitigating factor. We disagree. Just like the unethical conduct described in this disciplinary action, the prior disciplinary offenses demonstrate Mr. Kohout's general disregard for personal integrity and the honor of the legal profession. He has established a pattern of harmful conduct that this Court cannot minimize. We also observe that not all

of his prior discipline is remote; he was admonished in 2013 and barred from seeking judicial office in West Virginia in October of this year.

Under the facts presented in this case, we conclude that Mr. Kohout is unfit to practice law and that the annulment of his law license is necessary to protect the public, to reassure the public as to the reliability and integrity of attorneys, and to safeguard the interest in the administration of justice.

## IV. CONCLUSION

Mr. Kohout's intentional and numerous violations of the Rules, including the conversion of funds belonging to a client and a third party, warrant the annulment of his law license. We therefore adopt the sanctions recommended by the HPS and order the annulment of Mr. Kohout's license to practice law in the State of West Virginia.[22] We

---

[22] Pursuant to Rule 3.33(b) of the West Virginia Rules of Lawyer Disciplinary Procedure, Mr. Kohout may apply for reinstatement of his law license in five years. The rule provides that one seeking reinstatement of his or her law license

> may file a verified petition in the Supreme Court of Appeals reciting the cause of such annulment and what the person shall have done in satisfaction of requirements as to rehabilitation, restitution, conditions or other acts incident thereto, by reason of which the person should be reinstated as a member of the state bar and his or her license to practice law restored. The petitioner shall also file a completed reinstatement questionnaire provided by the Office of Disciplinary Counsel. At the time of filing the petition and questionnaire with the Clerk of the Supreme Court

(continued . . .)

further order that he make full restitution to Sonja Richard in the amount of $2,059.66,[23] and that he reimburse the LDB for the costs it incurred in connection with these proceedings.

License annulled.

---

of Appeals, the petitioner shall also file a copy of each with the Office of Disciplinary Counsel . . . .

We observe if the Court grants a petition for reinstatement, the Court may place conditions on reinstatement. W. Va. Rules of Lawyer Disciplinary Procedure 3.33(f).

[23] Mr. Kohout claims in his brief that it will be "impossible" for him to make restitution if his license is annulled. We note our order of restitution may be enforced in two ways: "(1) by the Office of Disciplinary Counsel seeking a contempt order from this Court, or (2) through the prosecution of a separate lawsuit by the client or a duly authorized representative of the client." Syl. pt. 4, in part, *Lawyer Disciplinary Bd. v. Ball*, 219 W. Va. 296, 633 S.E.2d 241 (2006).